383 A.2d 838

**COMMONWEALTH of Pennsylvania**

v.

**Larry Chester ESHELMAN, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 29, 1977.

Decided March 23, 1978.

Thomas M. Reese, Reese & Wilt, Martinsburg, for appellant.

William J. Haberstroh, D. Brooks Smith, Asst. Dist. Attys., Hollidaysburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION

EAGEN, Chief Justice.

Appellant Larry Chester Eshelman was convicted by a judge sitting without a jury of possession of a controlled substance with intent to deliver.[1] His post-verdict motions were denied, and he was fined $500.00 and sentenced to a prison term of not less than three nor more than twenty-two months. On direct appeal the Superior Court affirmed.[2] *Commonwealth v. Eshelman*, 236 Pa.Super. 223, 345 A.2d 286 (1975). We granted Eshelman's petition for allowance of appeal, and this appeal followed.

Eshelman contends that the trial court erred in refusing to suppress as the product and fruit of an unconstitutional search and seizure evidence used against him at his trial. During his pretrial suppression hearing, at which the only witnesses were the Commonwealth's,[3] testimony indicating the following facts was presented.

1. See The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, No. 64, § 13(a)(30), *as amended*, 35 P.S. § 780–113(a)(30).

2. Judge Spaeth filed a concurring opinion; Judge Hoffman filed a dissenting opinion.

3. Pa.R.Crim.P. 323(h) provides that at a suppression hearing "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing the admissibility of the challenged evidence."

On the afternoon of October 15, 1973, Glenn Norman Decker, an off-duty auxiliary policeman[4] in the borough of Roaring Spring, Blair County, went in search of a friend who was running his dogs in the woods behind the home of Eshelman's grandmother, Margaret Smith, where Eshelman also resided. The Smith property was located in Taylor Township, a short distance from the adjoining community of Roaring Spring. After talking with his friend, Decker, without permission, crossed the Smith property. Behind the house near the edge of the woods he noticed an old Cadillac, surrounded by weeds and without tags, which he knew had belonged to Eshelman. Through the windows of the car he observed that it contained a number of thin packages or rolls; the contents of the packages, wrapped in newspaper and tied with string, were not visible. Decker, however, recalled that he had heard a talk at his police station which indicated that this was a common method of wrapping and drying marijuana, and he became suspicious that the packages contained marijuana. He therefore reached inside a partially open window of the car, extracted one of the packages and, without opening it or examining its contents, took it to the police station at Roaring Spring and showed it to the chief of police, under whom he worked when on active duty. The chief then made arrangements by telephone for Decker to take the package to Trooper Winklbauer at the state police barracks at Hollidaysburg.

Accordingly, Decker brought the package to the state police barracks and turned it over to Trooper Winklbauer, who tested the contents and concluded the package contained marijuana. As a result of this information, Winklbauer sought and obtained a warrant to search the Cadillac. He then went to the Smith property, served the warrant on Mrs. Smith, searched the car, and removed from it other packages containing plants similar to the one removed by Decker. While searching the car, he also observed through the open door of a nearby shed other similar pack-

4. Decker was also a fulltime employee of the Enterprise Stone and Lime Company.

ages, but he did not then examine them. At this point Eshelman arrived, and Winklbauer arrested him and advised him of his rights. Eshelman admitted that both the car and the plants it had contained belonged to him. He also admitted that the plants inside the shed were his, stated "you might as well get them all," and helped the officer remove them.[5]

On the basis of this testimony, the suppression judge found that at the time he removed the marijuana from Eshelman's car, Decker was not on duty as an auxiliary policeman and "was not acting under the direction of any sovereign or police authority." He concluded that Decker's search and seizure, "while possibly constituting a civil trespass by a private citizen, [did] not constitute an unlawful search and seizure conducted under unlawful authority," and that therefore the evidence seized by Decker and the evidence subsequently obtained as a result of Decker's seizure need not be suppressed. In affirming, the Superior Court majority noted that the suppression judge, in his capacity of trier of fact, chose to believe the testimony of Decker that he was not searching for marijuana or acting under police orders when he trespassed upon the Smith property, observed that Taylor Township was outside Decker's jurisdictional territory, and emphasized a statute limiting the police powers of auxiliary policemen to periods when they are on active duty.[6] Eshelman, however, argues that the evidence

---

**5.** It was subsequently established at trial that the total weight of the marijuana plants confiscated from the car and the shed was seventy pounds.

**6.** "(a) Auxiliary policemen on active duty shall have the same powers as regular police officers of the municipality in which they are serving, and shall perform such other duties as may be assigned to them by the chief of police.

"(b) Auxiliary policemen when on active duty in a municipality other than the one in which appointed shall have the same powers in such municipality as regular police officers thereof.

"(c) The powers herein conferred may be exercised by auxiliary policemen only after they report for active duty and until they are relieved from duty."

Act of January 14, 1952, P.L. (1951) 2016, § 5, 53 P.S. § 735.

establishes Decker was acting as a police officer and allows "the clear inference" he was acting "under the direction of sovereign authority," and that, in any event, the exclusionary rule of the Fourth Amendment, as applied to the states by the Fourteenth Amendment,[7] should be extended to evidence improperly obtained by private citizens.

In *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), the Supreme Court of the United States held that the exclusionary rule is directed against the excesses of governmental action and that it is thus not applicable to evidence obtained by private citizens in pursuit of their own purposes and subsequently turned over to the government. Half a century later, the Supreme Court, after citing *Burdeau,* reiterated the view that the "target" of the exclusionary rule is "official misconduct." *Coolidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). Furthermore, our research has not disclosed any federal or state case in which the *Burdeau* rationale has been rejected. See generally Annotation, Admissibility, in Criminal Case, of Evidence Obtained by Search by Private Individual, 36 A.L.R.3d 553 (1971). We nevertheless conclude that, in the circumstances of the instant case, police involvement in the challenged search and seizure was such that suppression should have been ordered.

There is no question that if Decker had been on active duty at the time he conducted his warrantless search and seizure, or if he had carried it out at the direction of the police, evidence obtained pursuant to it as well as its tainted fruits would have had to be suppressed. See *Coolidge v. New Hampshire,* supra; *Commonwealth v. Dembo,* 451 Pa. 1, 301 A.2d 689 (1973).[8] Although the suppression judge was

It was established at trial that Taylor Township had no police department.

7. See *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Eshelman does not argue that suppression should have been ordered pursuant to Art. I, § VIII of the Pennsylvania Constitution.

8. The Commonwealth has not argued that the "open field" doctrine is here applicable, and the record clearly indicates that the marijuana was seized not from an open field but from an area within the

plainly justified in finding that Decker was not on active duty as a policeman or acting under the direction of the police when he trespassed upon the Smith property and removed the package from Eshelman's car, these facts, in our view, are not ultimately dispositive of the suppression issue.

In *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), decided at a time when evidence seized without warrant or probable cause by state police could subsequently be turned over to federal authorities and used in a federal prosecution so that the status of a state policeman with regard to the federal government was for Fourth Amendment purposes essentially that of a private citizen, contraband liquor had been seized from the appellants' car without probable cause by New York state troopers and immediately turned over to the federal authorities for purposes of prosecution. At this time the state prohibition act had been repealed, and the appellants argued that the National Prohibition Act by its terms made the troopers agents of the federal government in such cases. Justice Brandeis, writing for a unanimous Supreme Court, rejected the appellants' contention that at the time of the seizure the troopers were agents of the United States and concluded that it was immaterial whether or not state law imposed a duty on them to aid in the enforcement of the National Prohibition Act. Rather, he concluded that, in view of the established working relationship between state and federal authorities in these cases, the initiation of a federal prosecution on the basis of evidence seized "solely for the purpose of aiding the United States in the enforcement of its laws," 275 U.S. at 317, 48 S.Ct. at 139, was in effect a ratification of the wrongful search and seizure made on behalf of the United States, even though there was no evidence the federal authorities had participated in or directed it. Of particular significance for our purposes is the fact that the *Gambino* Court specifically distinguished *Burdeau* on the ground that

curtilage of Eshelman's home. See and compare *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968).

the seizure by private citizens in that case was *not* made solely for the purpose of aiding the United States, and it further noted that the federal authorities not only had nothing to do with the seizure but had no knowledge of it until several months later.

Moreover, in *Lustig v. United States*, 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949) (plurality opinion), Justice Frankfurter concluded that

"[t]he decisive factor . . . is the actuality of a share by a federal official in the *total enterprise* of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. *So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.* [Emphasis added.]

We quoted and applied this analysis to the conduct of state police officers in *Commonwealth v. Dembo*, supra, 451 Pa. at 11, 301 A.2d at 695.

With these principles in mind, we turn once more to the circumstances of the instant case. Although Decker was unquestionably off-duty and engaged in a private pursuit when he trespassed upon the Smith property, his testimony at the suppression hearing was that when on active duty as an auxiliary policeman he regularly wore a uniform, carried a gun, and rode in a squad car; he appears to have engaged in the normal functions of a police office with some frequency. Furthermore, he testified that he became suspicious of the contents of Eshelman's car because of information he had received at his police station about how marijuana was dried and wrapped. In addition, his testimony clearly indicated that he appropriated the package containing marijuana from a place where he had no right or authority to be and where Eshelman had a reasonable expectation of privacy solely for the purpose of turning it over to his superior on the police force for police investigation; he testified that after removing the package, he did not open it

or examine its contents but immediately took it unopened to the chief of police.

Thus, we must conclude that, although without authority to do so, Decker was acting as a police officer when he removed the package and turned it over to the police. See *People v. Martin*, 225 Cal.App.2d 91, 36 Cal.Rptr. 924 (1964) (police officers outside their jurisdiction, though technically private citizens, regarded as agents of the state on the basis of their conduct). Compare *State v. Pearson*, 15 Or.App. 1, 514 P.2d 884 (1973) (reserve police officer servicing a car in the ordinary course of employment who discovered recently-smoked marijuana in the ash tray held a private citizen), with *State v. Brothers*, 4 Or.App. 253, 478 P.2d 442 (1970) (off-duty police chief who came to home as ambulance operator, returned later that night to search, held a police officer at time of search). Compare also *Commonwealth v. Gordon*, 431 Pa. 512, 517, 246 A.2d 325, 328 (1968), cert. denied 394 U.S. 937, 89 S.Ct. 1215, 22 L.Ed.2d 469 (1969), in which, holding a challenged blood sample admissible, we stated: "*The police were in no way connected with the extraction,* and merely received from the hospital a sample of blood already on hand and *extracted for proper purposes.*" [Emphasis added.]

██ Further, we observe that the Roaring Spring police chief did not merely receive the purloined package from Decker and pursue his own investigation; rather, he arranged for Decker himself to take the suspected marijuana to the state police for further investigation. We agree with Judge Hoffman's dissenting opinion in the Superior Court that this was "an act totally inconsistent with the theory that Decker was a mere private citizen." 236 Pa.Super. at 230, 345 A.2d at 290. It is fundamental agency law that an act outside the scope of one's authority may be ratified by the subsequent conduct or behavior of the principal on whose behalf one purports to be acting. See, e.g., *Pennsylvania Labor Relations Board v. Sand's Restaurant Corp.*, 429 Pa. 479, 240 A.2d 801 (1968). In our view, the conduct of Decker's superior in the police department upon receiving

the package from Decker in effect ratified Decker's unauthorized acts on behalf of the Commonwealth. Cf. *Gambino v. United States*, supra; *State v. Anonymous (1977–78)*, 34 Conn.Sup. 104, 379 A.2d 946 (1977) (evidence wrongfully seized by police informer on his own initiative and turned over to the police suppressed under ratification theory).

Additionally, since Decker testified that he brought the package to his chief without opening it, it is apparent that it must have been opened and its contents examined for the first time by the police, in their presence, or at their direction.[9] Thus, whether the wrongful search initiated by Decker was not completed before the police had participated in it, *Lustig v. United States*, supra, or whether the police participated in a separate warrantless search of the unopened package in the contents of which Eshelman retained a privacy interest, cf. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), we conclude that, regardless of Decker's status, the Commonwealth failed to prove Eshelman's constitutional rights were not violated. See *People v. McGrew*, 1 Cal.3d 404, 82 Cal.Rptr. 473, 462 P.2d 1 (1969), cert. denied, 398 U.S. 909, 90 S.Ct. 1689, 26 L.Ed.2d 67 (1970) (footlocker opened by suspicious freight agent on his own initiative, closed packages discovered within and later opened for the first time by police and federal agent, contents of packages suppressed).[10]

**9.** The testimony at the suppression hearing does not indicate who opened the package for the first time, or when and where this was done. The testimony merely shows that Decker did not open it before taking it to his chief and that Trooper Winklbauer later examined its contents. Eshelman's counsel at the suppression hearing stipulated, however, that his objection was not to the conduct of Trooper Winklbauer.

**10.** In the instant case, the Superior Court majority cited in support of affirmance that court's previous decision in *Commonwealth v. Kozak*, 233 Pa.Super. 348, 336 A.2d 387 (1975). In our view, however, *Kozak* is distinguishable on its facts. An airline employee in the course of his ordinary duties there opened two unclaimed suitcases in an effort to determine their ownership. He also opened a package contained in one of the suitcases and discovered a sweet-smelling, grassy, leafy material. He reported this to the police in whose presence the suitcases were reopened.

For the reasons stated above, the order of the Superior Court and the judgment of sentence are reversed and a new trial is granted.

PACKEL, J., did not participate in the decision of this case.