WOLFE, P.J.,
For disposition is defendant’s pretrial motion to suppress evidence, to wit, the blood alcohol content results of 0.126 percent after defendant’s blood was extracted and tested by the Warren General Hospital following a one-car accident on June 8, 1990.
The facts as disclosed by the suppression hearing are not in dispute.
On June 8, 1990, Officer Gerald Falconer of the Conewango Township Police Department investigated a one-car collision near the Warren State Hospital on North State Street in North Warren. He stated the accident occurred at approximately 12:03 a.m., and when he arrived at the scene the fire department was spraying a vehicle which was under conflagration with very extensive damage, in that it was determined by the markings on the roadway it had failed to negotiate a curve and struck a tree. The record is silent as to the vehicle striking the tree; *377 however, the preliminary hearing testimony of July 17, 1990, (transcript at 13) concludes the car was against a tree on the bank of the creek, and the back end of the car was sticking out into State Street and the whole hood of the car was on fire. The officer stated the deceased passenger was lying outside of the car with a Michelob bottle lying next to his foot on the roadway. He attempted to examine the interior of the car and thought there was another beer bottle on the inside of the vehicle but could not make that conclusion as there was a lot of steam and smoke coming from the vehicle. The officer determined defendant was the operator of the vehicle after he spoke to two doctors, psychiatrists who lived on the hospital grounds and had removed defendant from behind the steering wheel.
The officer contacted the Sheriff’s Department and requested it contact the hospital and advise the hospital he would be en route and would request a blood alcohol analysis. When the officer arrived defendant was in surgery, and it was impossible to talk to him.
On the issue of probable cause to obtain a blood alcohol result, the officer, in cross-examination, stated:
“Q: What at the scene did you rely on as the basis for that request?
“A: Mostly from the magnitude of the accident, the multiple violations and the way the accident occurred at such a high rate of speed, the loss of control of the vehicle, the erratic driving, there is a very — this is a very erratic accident the way this occurred. He went into a curve two or three times, in my opinion, as fast [sic] as he should have. He slid sideways across the road leaving side slip marks, not because he lost control, because the vehicle, itself, was sliding sideways. Very severe *378 impact would indicate the high rate of speed and just from past experience with these types of accidents.”
Dr. Albert Doyle, M.D., employed at the hospital, was on duty in the emergency room and testified he initially treated defendant upon his arrival, that he was not requested to perform a blood alcohol test, but he did a blood alcohol test because, in his opinion, this was a trauma case, and the hospital always does such a test when there is a car accident and there is violent trauma to a person. Dr. Doyle further testified the blood alcohol test was a standard procedure in trauma cases. This witness stated on August 4 he added an addendum to his medical chart at the request of his superior, Dr. McGill, who had called him and wanted the witness to put “some note on there stating why I ordered the blood alcohol level.” The witness concluded that he ordered blood extraction for medical reasons, and the police did not ask for it.
Dr. Charles MacKenzie, M.D., the surgeon, testified he attended defendant, and that he knew that the blood extraction had been made as it was part of the trauma profile on multiple-injury cases. This witness stated the blood results are useful in a question of a head injury before the patient is put to sleep for any changes that may occur to determine if they are due to trauma inside the head or from some chemical problem.
Witness Hope Weckerly testified as a medical technologist in the laboratory that Dr. Doyle orally requested a trauma panel which consists, inter alia, of blood alcohol content. She stated it was not unusual to receive verbal orders of this nature during the course of examination.
Dr. Douglas McGill, M.D., testified he is the Director of Emergency Services, and after receiving *379 a letter from Mr. Smith* he inquired of Dr. Doyle if he had ordered a blood alcohol level examination and after an affirmative response suggested Dr. Doyle indicate on the record such order.
This witness testified why the addendum was requested:
“Well, the subject of your letter concerning the blood alcohol was brought to my attention because the staff was concerned that there was no order for blood alcohol. On the one hand I felt that there didn’t have to be an order for the blood alcohol, but Miss Jackaluka, our medical records person, felt that if Dr. Doyle could remember ordering such a blood alcohol level it could be contributory to the record to add and so asked him if he remembered it and he said he did and related to Miss Jackaluka’s advice which .seemed reasonable to me.”
Dr. McGill recognized at the time he requested the addendum that defendant was involved in criminal proceedings.
Finally, the Commonwealth and defense stipulated to admit to the record the preliminary hearing transcript.
Initially, we conclude the Commonwealth had no probable cause to request a blood alcohol test. There is no evidence either directly or by inference from any witness that could formulate probable cause the defendant was operating a vehicle while under the influence of alcohol at the time of the occurrence. Indeed, the Commonwealth does not disagree with this and has in its brief argument stated categorically:
“The Commonwealth respectfully contends that the blood alcohol test was properly drawn for medical reasons and not at the request of law enforce *380 ment. Without the requisite agency relationship of the Warren General Hospital personnel to a law enforcement agency, the blood test performed on Timothy Jackson falls outside- the scope of the Fourth Amendment protection.”
Notwithstanding, the teaching of Commonwealth v. Danforth, 395 Pa. Super. 1, 576 A.2d 1013 (1990), the severity of an accident is insufficient probable cause to request and perfect a blood test. Here, Officer Falconer did not observe defendant operating the vehicle, did not talk to him at the scene or at the hospital, and concluded a blood alcohol examination was a closed issue because he could not secure defendant’s consent. This leaves only for consideration if the blood alcohol test results should be available to the Commonwealth in that it was allegedly extracted for medical purposes only.
The law in this area is well settled as written in Commonwealth v. Borecky, 277 Pa. Super. 244, 419 A.2d 753 (1980). There the court established and reaffirmed Fourth Amendment prohibitions against illegal search and seizures are not applicable to private citizens:
“It is firmly established that the Fourth Amendment’s prohibition against illegal search and seizures applies only to the actions of governmental authorities and is inapplicable to the conduct of private parties. See, e.g. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Commonwealth v. Dembo, 451 Pa. 1, 301 A.2d 689 (1973). However, it is equally well-settled that the evidence gathered through a search by a private individual must come to the state upon a ‘silver platter’ and not as a result of any instigation by state authorities or participation by them in the illegal activities. Byars v. United States, 273 U.S. 28, 33, *381 47 S.Ct. 248, 250, 71 L.Ed 520 (1927). The critical factor, as the United States Supreme Court has stated, ‘is whether (the private individual) in light of all of the circumstances of the case, must be regarded as having acted as an “instrument” or agent of the state . . ..’ Coolidge v. New Hampshire, 403 U.S. 443, 487, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971).” To the same effect is the teaching of Commonwealth v. Eshelman, 477 Pa. 93, 383 A.2d 838 (1973).
Instantly, Officer Falconer testified at the preliminary hearing held July 17, 1990, (transcript at 43) that he had “called ahead and requested a blood test, and when I got there they said I couldn’t talk to him, so he couldn’t sign the forms and couldn’t get a blood test.” Thereafter, the Commonwealth secured the results of the blood test via a court order directed to the hospital for its records. Further, the officer stated he had “radioed the Sheriff’s Office and requested that they do a blood test, but when I arrived there I was unable to speak to him and he was unable to sign the form. The Sheriff’s Office was supposed to call and request that.” (Transcript at 44.) His testimony continues that his reason for calling for a blood extraction is that he saw beer bottles at the scene, not being able to identify if there were one or two because of the steam and smoke. The officer categorically stated it was by reason of the one beer bottle on the road that he ordered the blood test. (Transcript at 44, 45.) Additionally, the same record shows the sheriff had advised Officer Falconer on the radio that the hospital had been notified to do the blood test. It was the officer’s opinion the blood extraction was not for his benefit as there were no consent forms signed by defendant.
*382 Finally, Officer Falconer stated (transcript at 49) he talked to Dr. MacKenzie. “I said I was needing some information from him and I was concerned about doing a blood alcohol test, and he said, ‘We drew one to find out before we treat him any further.’ ”
On the basis of this testimony from the investigating and arresting officer, we have no reservations in concluding the hospital personnel were informed by the officer that he desired a blood extraction. An attempt to reconcile Dr. Doyle’s testimony with that of Officer Falconer is not clear, but sufficient to make this conclusion. Dr. Doyle testified on cross-examination at the suppression hearing (transcript at 25) he could not remember getting a request from the Sheriff’s Department for a blood alcohol test. Notwithstanding the hospital routinely orders a “trauma panel” profile which includes a blood alcohol extraction, this is done for precautionary purposes, according to Dr. MacKenzie’s testimony. Here, there is no evidence the extraction was necessary by reason of the injuries defendant received or was utilized in any way in surgery.
If the third party must deliver the evidence to the Commonwealth on a “silver platter,” it should be apparent here the platter is tainted. It is also clear Officer Falconer instigated the extraction request. Constitutional rights may be circumvented when hospital personnel are aware the police desire any incriminating evidence, notwithstanding the accused has given no consent to deliver the evidence to the Commonwealth, all under the guise of medical precaution. The court found in Commonwealth v. Cieri, 346 Pa. Super. 77, 499 A.2d 317 (1985), that the hospital personnel withdrew defendant’s blood for the purpose of treating him for injuries sustained *383 during the accident. “The procedure was routine, and was performed before any hospital personnel learned that the police had requested a blood sample. Had nothing further occurred, therefore, the withdrawal of appellant’s blood would have been a ‘private’ search, not implicating appellant’s Fourth Amendment rights.” (emphasis supplied)
Moreover, the hospital, after receiving the letter from Attorney Smith requesting hospital records, requested Dr. Doyle to supplement his record by indicating he ordered the trauma panel. Obviously, this is suspect and compromises defendant’s right of privacy.
Officer Falconer could not formulate any probable cause defendant was operating while under the influence by reason of his investigation at the scene of the accident, nor was he able to do so thereafter at the hospital in that he did not speak with defendant, nor did any hospital personnel detect any use of alcohol from defendant. The blood extraction came into possession of the Commonwealth by reason of the hospital’s extraction which was not in fact used for medical treatment.
Constitutional rights would be totally neutralized if hospitals are permitted to deliver incriminating evidence to the Commonwealth indiscriminately simply by a procedural policy as here which the Commonwealth ratifies and thus makes the hospital its agent. There would be no need for the Commonwealth to formulate probable cause any crime has been committed whatsoever if this were the case. An injured party has the right of expectation that he will be delivered either consciously or unconsciously to a hospital where his rights of privacy will be protected. Moreover, this record is barren since defendant was unable to communicate with the *384 officer, even if he had wanted to, in that the officer was informed by Dr. MacKenzie he could not see defendant. Thus, defendant had no opportunity to explain his position to the officer to again give the Commonwealth an independent means of determining probable cause.
Finally, it is acknowledged defendant was never placed under arrest by Officer Falconer, defendant did not give his consent to the hospital to extract his blood for alcohol content, and did not consent to the delivery of the alcohol content data to the police by the hospital; it is a serious question if the hospital personnel had knowledge the police requested the blood extraction, and as stated, the Commonwealth admits there was no probable cause to conclude defendant was operating while under the influence.
For these reasons we enter the following
ORDER
And now, November 9, 1990, defendant’s motion for suppression is granted.

 This is in reference to Barry L. Smith, Esquire, counsel for defendant.